**Not For Publication**                                    **[35]**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                              :
TIMOTHY MASLANKA,                             :
                                              :      Civil Action No.: 04-CV-5477(FLW)
                 Plaintiff,                   :
                                              :            **Opinion**
         v.                                   :
                                              :
JOHNSON & JOHNSON, INC., <u>et al.</u>,       :
                                              :
                 Defendants.                  :
_____     :


**<u>WOLFSON</u>**, **<u>United States District Judge</u>:**

        Presently before the Court is a motion for summary judgment filed by defendant, Janssen

Pharmaceutica ("Janssen"), a division of Johnson & Johnson,[1] on the claims brought by plaintiff,

Timothy Maslanka**, pro <u>se</u>,** under the Americans with Disabilities Act ("ADA").[2] For the

_____

[1]Although Maslanka names Johnson & Johnson as a defendant, Maslanka does not specifically allege in his Complaint or his opposition papers that Johson & Johson employees subjected him to harassment, discrimination or retaliation. Because Maslanka's claims are directed at Janssen rather than Johson & Johson, his claims against the latter are dismissed.

[2]Maslanka's Complaint vaguely alleges harassment and wrongful termination which "produced . . . temporary disability," and that he was subject to "discrimination and retaliation." Luedeke Decl., Ex. L. However, the Charge of Discrimination he filed with the EEOC on September 30, 2002, clarifies his Complaint. Maslanka stated: "I believe that I have been discriminated against because of my disability in violation of the Americans With Disabilities Act of 1990, as amended, and in retaliation for filing previous charges of employment discrimination against Respondent." <u>Id.</u> at Ex. H. Although Maslanka's initial filing with the EEOC on April 23, 2001, checks the protected classes of "other" and adds a question mark next to "age," in addition to checking "retaliation," <u>Id.</u> at Ex. B., Maslanka's Complaint and opposition papers make no claims of discrimination independent of disability and retaliation.

foregoing reasons, Janssen's motion for summary judgment on all of Maslanka's claims is granted.

## I. Factual Background

Viewed in the light most favorable to Maslanka, the relevant facts are as follows. Maslanka was hired as a Sales Representative for Janssen, a pharmaceutical company, on June 26, 2000.  Luedeke Decl., Ex. A, 21:14-20. Maslanka's responsibilities included educating himself about Janssen's medications, conveying his "product knowledge" to physicians, including "proper prescribing habits for the medications that [he] was representing," interacting and exchanging selling ideas with other Sales Representatives in his territory, attending meetings, drafting reports regarding his physician visits, holding speaker programs for physicians, maintaining a Company vehicle, and "just in general represent[ing] the company in a professional manner."  Id. at 22:5-25:17.

At the beginning of his employment, and periodically throughout, Maslanka received training from Janssen which included instruction on Janssen's Health Care Compliance Policy. Id. 31:3-32:10.  The policy governed, among other things, interactions between Janssen Sales Representatives and physicians, and included rules as to "what [employees] could spend on a doctor, where you could spend it." Id. at 31:3-18. Continued employment with Janssen was contingent on attending these training sessions and passing subsequent written tests.  Id. at 30:8-12; 32:4-18.

Maslanka's direct supervisor was Robert Fronius ("Fronius"). Because Maslanka was a field-based employee, he only had personal contact with Fronius once a week. However, he communicated with Fronius almost daily, mostly through emails.  Id. at 33:8-15.  Fronius also

2

conducted periodic "ride-along" or "work-with" sessions with Maslanka, where Fronius would spend two days with Maslanka, observing Maslanka's sales calls and activities in the field and then offering feedback on his performance.  Id. at 33:18-25; 34:1-3.

Initially, Maslanka had a positive relationship with Fronius, and Maslaka states that two of his initial evaluations from Fronius were positive. Id. at 34:4-7; 35:9-37:3. But in or around February 2001, Fronius became concerned with Maslanka's job performance, noting several shortcomings in a February 22, 2001 "work with" letter. Fronius Decl., ¶5; Ex. D. Fronius' concerns continued. Following a "work with" session during April 16-17, Fronius drafted a "Field Conference Report" which described in detail his issues with Maslanka's performance, including compliance issues. Fronius Decl. ¶6; Ex. E. Fronius issued a Formal Warning to Maslanka, dated April 23, 2001, in which he reiterated his concerns about Maslanka's performance and outlined the corrective action that Maslanka needed to take to avoid Formal Probation. Fronius Decl., ¶ 7; Ex. F. Maslanka refused to sign the April 23, 2001 Formal Warning. Objections to Declaration of Robert Fronius, ("Plaintiff's Objections"), ¶2.

Maslanka argues that Fronius' negative evaluations, and his affidavit describing them, are inaccurate and biased. According to Maslanka, they were part of an effort to single him out for termination. Id. at ¶2. Maslanka attempts to discredit Fronius' evaluations with (1) sales reports indicating that he "maintained consistently the rank of #1 in the district" for certain drugs; (2) positive client responses to informal questionnaires created by Maslanka; (3) favorable written remarks concerning Maslanka made by coworkers; and (4) references. Luedeke Decl., Ex. A, 124:11-14; Plaintiff's Objections, ¶¶3-7 (and attached exhibits).

On April 23, 2001, the same date as the Formal Warning, Maslanka filed a complaint with the EEOC's Pittsburg office. Luedeke Declaration, Ex. B.[3]  In response to the question of "why you feel you were treated differently," Maslanka referred to harassment by Fronius. On the EEOC's General Information Questionnaire, Maslanka checked "Harassment" as an "Issue" and checked "Retaliation," and "Other" as "protected class(es)," also placing a question mark next to "Age." No other categories (e.g. "Race," "Color," "National Origin") were checked. Id.  In his deposition, Maslanka explained that placing the question mark next to "Age" was a precautionary measure because he did not know whether or not his being "considerably older" than Fronius was a factor in Fronius' behavior towards him. Id. at Ex. A, 77:9-11.

At his deposition, Maslanka claimed that there are "probably many factors involved" in Fronius allegedly writing negative evaluations in an effort to terminate Maslanka. Id. at Ex. A, 56:5-6. These include: (1) Janssen's alleged intent to reduce its employee work force by one to ten percent per year; (2) loss of Maslanka's "likeability factor" to Fronius; (3) Fronius' jealousy of Maslanka's cabin and "station in life"; (4) Fronius being upset because Maslanka expressed feelings for a female Sales Representative; (5) Fronius' desire to assign Maslanka's territory to someone who was hired shortly after Maslanka was terminated and (6) retaliation for reporting him to the EEOC. Id. at 50:3-58:23.[4]

---

[3] Although the Formal Warning is dated April 23, 2001, Maslanka avers that it was presented to him at a meeting with Fronius on April 25, 2001, which was after he filed the complaint with the EEOC. Plaintiff's Closing Arguments and Summary Declaration ("Plaintiff's Summary Declaration"), ¶2. However, Maslanka does not allege that the Formal Warning was not in fact written on April 23, 2001, or that Fronius was aware of the EEOC complaint before he wrote the Formal Warning.

[4] As Janssen points out, Maslanka's claim that Fronius started writing negative evaluations of Maslanka in February 2001 as a form of retaliation for going to the EEOC makes no sense, as there is no evidence in the record that Maslanka contacted the EEOC prior to April 23, 2001.

In a handwritten addendum to the complaint, Maslanka describes an incident on April 16 or 17, 2001, during which Fronius harshly criticized Maslanka's work performance during a "ride with." Id. at Ex. B, 8-9. According to Maslanka, Fronius' demeanor was "hostile, mean-spirited, excessive, not fair balanced [sic], and discriminatory." Id. at 8. When Maslanka attempted to defend himself against Fronius' assertions, Fronius became "incensed," at which point Maslanka decided to sit and "let him vent for over 3 hours." Id. Maslanka provides a sample of Fronius' comments, which included statements such as, "Tim, you just don't fit in; Tim, your selling skills stink; I got my best friend a job with Janssen, a man who I dearly love, and the Godfather to my sons, and he couldn't make it at Janssen." Id. at 8-9. Additionally, during this conversation, after Maslanka remarked to Fronius about an incident in which his dog had been caught on an electric fence, Fronius responded, "Tim, you're going to smell like that dog every time I ride with you." Id. at 9. Maslanka characterizes this incident as the "precipitating event" that caused him to file the EEOC complaint. Id. at 8. However, Maslanka's exposition gives no hint as to how this incident was a form of discrimination on the basis of a disability.

In a letter to a Stan Davis[5], dated May 4, 2001,[6] which was apparently a follow-up to a previous meeting and telephone conversation between Davis and Maslanka, Maslanka requests a status update regarding his complaints concerning Fronius' (1) "hostile behavior during ride with sessions;" (2) "recording false and misleading information on company documents;" (3) "hateful

---

[5] The nature of Mr. Davis' employment with Janssen is unclear from the record. The content of the letter suggests that he is employed in Human Resources, and had some authority to resolve the conflict between Maslanka and Fronius.

[6] There is an apparent error in dates. The letter is dated "5/04/2001," but it references a meeting that took place on "5/8/2001" and a phone conversation that took place on "5/11/2001."

comments regarding other employees;" (4) "repeated threatening remarks regarding

[Maslanka's] career with Johnson and Johnson;" and (5) "intimidating tactics."  Plaintiff's

Opposition, Ex. EE1, 8. Additionally, Maslanka states:

> I respectfully disagree with your decision to have me continue in my current
> assignment under Mr. Fronius' management, in a hostile work environment,
> however, I am committed to following the direction of Human Resources.
> I offered 3 solutions:
> 1. Report to a neighboring manager
> 2. Relocate me
> 3. Move Mr. Fronius

Id.  The letter was copied to the EEOC.

In June 2001, Maslanka was placed on temporary disability leave. Luedeke Decl., Ex. A,

112: 17-20. Janssen asserts that Maslanka needed leave because of a knee injury caused by a slip

and fall accident which occurred on the job. Fronius Decl., ¶10; Luedeke Decl., Ex. C. However,

Maslanka points to letters from his physicians which support an inference that Maslanka also

took leave because he was suffering from anxiety and depression, at least partly attributable to

his relationship with Fronius. These letters refer to Maslanka's relationship with Fronius as a

cause of his condition, and contain recommendations that Maslanka not have interaction with

Fronius upon his return to Janssen. See Plaintiff's Opposition, E1-E4.

In a memorandum dated June 23, 2001, Maslanka's physician, Dr. Reilly, states:

> [Maslanka] was seen for the first time by me recently for acute job situational
> stress and significant problems with his immediate company supervisor . . . [A]
> work up revealed significantly elevated TSH, impressive elevated lipids, and
> hypertension identified for the first time.  Because of the magnitude of the
> anxiety, disturbed sleep, and depression . . . I have asked for the earliest opening
> of Dr. Mehta, consultant in Internal Medicine/Psychiatry for his assistance . . .
> We will plan to complete any work required forms, excuses, etc. with justifier as
> significant job related anxiety/depression.

Id. at 4-5.

In a letter to Janssen dated August 20, 2001, Dr. Reilly states:

Timothy Maslanka has been a patient of mine since 6-7-01.  During my recent treatment of Mr. Maslanka his conditions identified have been: significant symptomatic Anxiety Disorder (300.21), as well as significant severe Major Depression (296.2).  This combined diagnosis manifests itself in progressive depression, lack of willingness of any socialization, inability to concentrate on his work tasks or enjoyment of those things proven enjoyable by way of hobbies or avocations in the past, disturbed sleep patterns, and inability to motivate or accomplish day to day routine tasks that are required. My recommendations have been the avoidance of his stressful work situation until specialist consultations can be accomplished, the problems addressed, medications in place, counseling, and successful lessening of the symptomatology before return to his full work commitment. In my opinion it is the best interest of Maslanka in addition to the off work period . . . and resolution of magnitude of the symptoms; that there be serious consideration given to work place adjustments that eliminate his ongoing day to day stressful exposure and relationship with his current supervisor. This additional intervention might very well hasten the recovery period, the return to work and reduce any need for hospitalization and in-hospital care.

Id. at 2.

A note from another of Maslanka's physicians, Dr. Mehta, dated November 12, 2001, states that "It is our recommendation that Timothy Maslanka return to work at Janssen on December 1, 2001 under a different supervisor." Id. at 3. Further, Dr. Reilly wrote a follow up note dated November 29, 2001, stating: "I stand by my original medical opinion - Tim should not work with the supervisor in question. Further, this opinion is re-inforced by the documented opinion of my expert consultant, Dr. Mehta, whose judgment I rely upon in this case as well as many past referrals." Id. at 6.

In a letter to Janssen dated November 29, 2001, Dr. Mehta further advised that:

Timothy Maslanka has been a patient of our [sic] since June 28, 2001.  During our treatment of Mr. Maslanka, I have made a diagnosis of Major Depression, single 296.2 and Anxiety Disorder 300.21.  This condition manifests itself in excessive crying, poor concentration, poor sleep patterns, decrease in energy, feelings of hopelessness and helplessness . . .  In addition, it is in his best interest to avoid stressful situations.  I have informed Mr. Maslanka that it is my opinion,

7

> stated to a reasonable degree of medical certainty, that he would be best suited by
> having his workplace [make] a minor accommodation to deal with his condition.
> The accommodation that is required, in my opinion, is for Mr. Maslanka to be
> moved from under his current supervisor and or cut out of his current department.
> I believe that Mr. Maslanka is capable of performing the essential functions of his
> job and that the current situation with his manager creates an undue amount of
> stress and is aggravating his condition and may cause the condition to progress to
> a debilitating disability.

Id. at 1. Finally, Maslanka claims that his relationship with Fronius caused him to be unable to sleep. As he states in his deposition, "When I discovered what Mr. Fronius was trying to do, the trauma of that wouldn't allow me to sleep. I went three nights with absolutely no sleep over the weekend." Luedeke Decl. Ex A, 112:22-25. A memorandum dated "10/16/2001" to the EEOC reveals that Maslanka notified the Commission of his diagnoses and the accommodations recommended by his physicians. Plaintiff's Opposition, Ex. EE1, 1.

As of December 1, 2001, Dr. Mehta cleared Maslanka to return to employment at Janssen "without restrictions," Luedeke Decl., at Ex. D; Luedeke Decl, Ex. A, 120:12-15, even though, in his November 29, 2001 letter, supra, Dr. Mehta advised Janssen that Maslanka should be put under a different supervisor or in a different department. As an accommodation for his knee injury, Janssen provided Maslanka with a minivan. Luedeke Decl. Ex. A, 120:12-20. However, the record indicates that he was still working with Fronius upon his return to Janssen. Upon returning from disability leave, Maslanka and Fronius went through a "reorientation," which Maslanka claims to have "passed with flying colors." Id. at 119:14-18. The details of this process remain unclear from the record. It is clear, however, that the "reorientation" did nothing to improve relations between Maslanka and Fronius. In a charge of discrimination filed with the EEOC on September 30, 2002, Maslanka claims that Fronius continued his negative treatment

and harassment of Maslanka upon his return from disability leave. See Luedeke Decl., Ex. H.

According to Maslanka:

> I returned to work on December 6, 2001, and was told by Bob Fronius that he did not care about my disability and was going to pick up where he left off before I went on leave. Bob Fronius continued his harassment of me and said if my numbers did not improve, I would not be long for this world as far as Janssen was concerned. Bob Fronius gave me a negative employment evaluation in December 2001.

Id.; see also Luedeke Decl., Ex. A 156:8-10 ("[I]n the meeting . . . I was in with [Fronius] in

Decmeber, he said he was going to pick up where he left off [and that] [h]e was going to make it

worse for me now").

Fronius contends, however, that Maslanka's job performance did not improve upon his

return from leave. Fronius Decl., ¶11. Thus, on January 18, 2002, Fronius issued Maslanka a

second Formal Warning letter which specified, in great detail, Maslanka's performance

deficiencies. Id. at Ex. H. Again, Maslanka disputed Fronius' assessment of his work

performance and refused to sign the document. Plaintiff's Objections, 3-4.

Sometime in either January or February 2002, Maslanka initiated a claim against Fronius

through Janssen's alternative dispute resolution process. As a result, Fronius claims that "from

February 2002 until his termination in June 2002, I had minimal contact with [Maslanka],

though I did contact him occasionally regarding some administrative matters." Fronius Decl.,

¶12. Maslanka claims that, according to the company's mediation policy, Fronius was to have no

contact with Maslanka, and that there was no contact between them until May 28, 2002.

Plaintiff's Objections, 4.

According to Janssen, Maslanka was terminated because of an alleged violation of the

Health Care Compliance Policy relating to payment of the travel expenses for a physician's

spouse attending a sponsored meeting. Fronius Decl., ¶14. A Duragesic regional advisory board meeting was to be held in April of 2002, the purpose of which was to have a roundtable discussion with physicians who were high prescribers of Oxycontin, a medication in direct competition with Janssen's Duragesic product. Luedeke Decl., Ex. A, 135:16-21; 136:1-19. Less than two weeks prior to the meeting, Janssen sent Maslanka a written invitation to be forwarded to a Dr. Hess. Id. at 135:19-23; Maslanka Decl. ¶5; Plaintiff's Opposition, Ex. A1, 3-5. The invitation stated:

> Your hotel room, air and ground transportation along with all group meal functions are provided by Janssen Pharmaceutica. *Please Note: Due to Healthcare Compliance Guidelines, Jassen Pharmaceuticals Products L.P. will not be able to cover any additional hotel requirements and meals that are not sponsored. All guest travel, meals and activities are the responsibility of that individual. Please see "Activity Form."* Our travel agents will be able to assist you in arranging your spouse/guest's airline ticket.

Plaintiff's Opposition, Ex. A1, 4. (emphasis in original). Further, Janssen's Health Care Compliance Policy provides:

> Janssen does not encourage inviting spouses or guests to Janssen sponsored events. However, in the event that the spouse attends, only entertainment and meals can be expensed, but must not exceed the meal and entertainment allowances per person, stated above.

Fronius Decl., Ex. I (emphasis added).

Dr. Hess accepted the invitation and requested that Maslanka make travel arrangements for him and his spouse. Maslanka explains:

> As a courtesy and convenience to Dr. Hess in light of the short notice, and because the invitation specifically referenced providing assistance in making the travel arrangements for the spouse or guest of the invitee, I made the travel arrangements for both Dr. Hess and his wife Cindy by contacting J & J travel . . . and booking them with my corporate credit card. Again, it was understood that Dr. Hess would reimburse Defendants for the travel expenses of Dr. Hess's wife Cindy . . . I believed I was acting in compliance with the specific invitation and

10

> directive from Johnson & Johnson as to this conference, since it indicated and
> directed that assistance be provided in making travel arrangements for the
> invitee's spouse.

Maslanka Decl., ¶¶9-11; Hess Decl., ¶4 ("It was clearly understood that Mr. Maslanka was just

making the travel arrangements for my spouse as a courtesy and a matter of convenience for

booking purposes, and at no time did Mr. Maslanka indicate or imply that my spouse's travel

costs or other expenses would be covered by Johnson & Johnson"). Further, Maslanka asserts

that:

> The standard procedure for making travel arrangements was that the Sales
> Representative would make those arrangements by contacting J &J travel and
> providing the information regarding the individual(s) and the time and location,
> with the corporate credit card account number of the representative being
> provided to J & J.  J& J travel would actually do the booking of the airline flight.

Maslanka Decl., ¶12.

In his deposition, when asked whether he purchased the ticket for Mrs. Hess, Maslanka

insists that he did not. Luedeke Decl., Ex. A, 142:13-14.  Instead, he says that "if that's a

Johnson & Johnson American Express, that means that Johnson & Johnson paid for it."  Id. at

141:16-20.  He does concede, however, that his corporate card was used to purchase both tickets.

Id. at 141:21-25; 142:1-2; Maslanka Decl., ¶9 ("I made the travel arrangements for both Dr. Hess

and his wife Cindy by contacting J and J travel . . . and booking them with my corporate credit

card"). According to Maslanka, this was the first time he made flight arrangements for a client.

Supp. Maslanka Decl., ¶3. Additionally, both he and Dr. Hess state that they were given short

notice of the conference date. Maslanka Decl., ¶9; Hess Decl., ¶3.

On May 28, 2002, Fronius contacted Maslanka via telephone, in what Maslanka

describes as "an intimidating tone," to demand a meeting the following day. Plaintiff's

Objections, 4. Maslanka contends that this contact was a violation of the ongoing mediation process. Id.  As a result of this contact with Fronius, Maslanka suffered a panic attack and drove to an emergency room. Id. Maslanka has produced a note dated May 29, 2002 from Dr. Mehta stating: "[Maslanka] is currently suffering from a severe panic attack and is unable to return to work for at least 4 working days." Plaintiff's Opposition, Ex. B13, 2. On June 3, 2002, Dr. Mehta wrote another note stating: "Due to his condition in relation to his Boss, [Maslanka] is unable to return to work until further notice."  Id. at 1.

During Maslanka's leave of absence, Janssen terminated him effective May 30, 2002. The termination letter, dated June 14, 2002, stated:

> Please be advised that your employment with Janssen Pharmaceutica has been terminated effective May 30th, 2002 due to your violation of our Health Care Compliance policy and regulations.  Specifically, you purchased an airline ticket for a customer's spouse to attend an Advisory Board meeting in April and charged the fare to your corporate American Express (Amex) card.

Luedeke Decl., Ex. G. Maslanka claims that he did not receive notification of his termination until approximately a month after his panic attack. Plaintiff's Objections, 4. Approximately two months after his termination from Janssen, Maslanka visited Dr. Hess, who offered him a check to cover Mrs. Hess's flight expenses. Maslanka Decl. ¶13. Maslanka refused, telling Dr. Hess that he was no longer employed by Janssen. Id.

On or about September 30, 2002, Maslanka filed a formal Charge of Discrimination with the EEOC, alleging that he had "been discriminated against because of [his] disability in violation of the Americans with Disabilities Act of 1990, as amended, and in retaliation for previous charges of employment discrimination against [Janssen]." Luedeke Decl., Ex. H. In the

12

charge,  Maslanka alleges that he "became disabled because of continued harassment and intimidation by Bob Fronius, Supervisor." Id.

Finally, a reference provided by Maslanka indicates that, subsequent to his termination at Janssen, Maslanka was employed on two occasions in the field of pharmaceutical sales. Plaintiff's Opposition, B5, 1.

## II. Procedural History and Maslanka's Request to Reopen Discovery

Maslanka filed a Complaint against Janssen in the United States District Court, Middle District of Florida, on December 31, 2003. Luedeke Decl., Ex. L. The case was dismissed on February 17, 2004 for Maslanka's failure to comply with a filing fee. After paying the fee, the case was reinstated, and on November 2, 2004, the matter was transferred to the District of New Jersey. On December 15, 2005 the case was dismissed for failure to prosecute. Docket No. 29, 1. Upon Maslanka's request, the case was again reinstated on January 3, 2006. Docket No. 7, 1.

A long history of discovery disputes ensued, with the Hon. Tonianne Bongiovani, U.S.M.J., finding that Maslanka failed to fulfill his discovery obligations on several occasions. Docket No. 29 at 2-3. Discovery closed in October of 2006, and on September 11, 2007, Judge Bongiovani denied Maslanka's request to re-address and/or reopen discovery issues pertaining to Janssen's allegedly deficient responses to Maslanka's discovery requests. Docket No. 37. Judge Bongionvani reasoned:

> Plaintiff's request is denied in part because discovery closed in October 2006 and because Plaintiff failed to preserve any discovery issues or request additional time to pursue discovery until significantly after the deadline [passed]. Further, Plaintiff was given the opportunity . . . to establish where and when he preserved his objections to Defendants' allegedly deficient discovery responses or where he specifically raised these issues with the Court. To date, Plaintiff has failed to do so. Instead, Plaintiff has simply stated that the Court "asked me to show you that the Motion to Compel was not an '11th hour' issue; I did this by faxing and

mailing you documents dating back to Summer '06 requesting 21 Discovery
Requests which opposing counsel has yet to produce." This singular statement is
wholly insufficient. Moreoever, in the interim, Defendants filed a Motion for
Summary Judgment, and the Court has since set a briefing schedule for that
Motion. At this late juncture, without a showing that Plaintiff preserved his right
to pursue discovery, reopening discovery would unduly delay the proceedings in
this matter. As a result, Plaintiff's request is denied.

Id.

In a sur-reply brief, Maslanka urges the Court to reopen discovery because his "file will
show that I the Plaintiff made discovery requests prior to the closing of discovery in October
2006." But just as Maslanka failed to show Judge Bongiovani where "in his file" he preserved
his objections to Janssen's allegedly deficient discovery responses, he suffers from the same
lapse here. Thus, as Judge Bongiovani previously held in the September 11, 2007 Order,
"[Maslanka's] singular statement is wholly insufficient" at this late juncture.

## III. Discussion

### A. Interpreting Maslanka's Claims

The totality of Maslanka's Complaint reads as follows:

Discrimination by Defendant led to use of false information and harassment and
wrongful termination of employment, which produced near financial and credit
ruination and temporary disability. Body of evidence shows my job performance
was meeting or exceeding high standards- no violations of co. policy, and that I
was victimized by discrimination and retaliation. Suit is being brought to recover
financial damages of $100,000 and prevent future corruption in the workplace.

Luedeke Dec., Ex. L.

A pro se complaint is subject to less stringent standards than the formal pleadings drafted
by lawyers. Haines v. Kerner, 404 U.S. 519, 520 (1972); cf Lewis v. Attorney General of U.S,
878 F.2d 714, 722 (3d Cir. 1989) (citations omitted) ("Fed. R. Civ. P. 8(f) states that '[a]ll
pleadings shall be so construed as to do substantial justice[,]" [and] [c]onsistent with this rule is

14

the well-established principle that a <u>pro se</u> prisoner's pleadings should be subject to less stringent standards of specificity and their complaints should be construed liberally").

Maslanka alleges that he was "victimized by discrimination and retaliation" and that "harassment" and "wrongful termination" caused him "temporary disability." Maslanka's EEOC filings give some substance to these claims. First, on April 23, 2001, Maslanka filled out a General Information Questionnaire at the EEOC alleging "harassment" and "retaliation." Luedeke Decl., Ex. B. Second, on September 30, 2002, Maslanka filed a formal Charge of Discrimination alleging that he "became disabled because of continuous harassment and intimidation by Bob Fronius, Supervisor." <u>Id.</u> at Ex. H. Maslanka further asserts that "I believe that I have been discriminated against because of my disability in violation of the Americans With Disabilities Act of 1990, as amended, and in retaliation for filing previous charges of employment discrimination against Respondent." <u>Id.</u>

Based on a fair and liberal reading of the Complaint and the record, the Court agrees with Janssen that Maslanka has alleged the following claims under the ADA: (1) disparate treatment discrimination; (2) retaliation; and (3) creation of a hostile work environment. Although it is not acknowledged by Janssen, a liberal reading of Maslanka's Complaint, in conjunction with Maslanka's EEOC Charge of Discrimination and the record, indicates that Maslanka's discrimination claim includes an allegation that Janssen failed to accommodate his alleged disability. Luedeke Decl., Ex. H (EEOC charge stating "I requested a transfer or relocation as an accommodation for my disability and it was denied by [Janssen]"). "Adverse employment decisions [in the context of an ADA discrimination claim] include refusing to make reasonable

15

accommodations for a plaintiff's disabilities." <u>Williams v. Philadelphia Housing Authority Police Dept.</u>, 380 F.3d 751, 761 (3d Cir. 2004).

In his opposition papers, Maslanka avers that "Plaintiff repeatedly asked to report to a different manager and despite the advice of two qualified physicians, the Defendants refused to do so and continue in their method of termination." Plaintiff's Summary Declaration, ¶3. A letter from Maslanka to Stan Davis, dated May 4, 2001, indicates that Maslanka requested to be removed from the supervision of Fronius. Plaintiff's Opposition, Ex. EE1, 8. A letter from Maslanka to Marion Smith, dated December 5, 2001, makes the same request upon Maslanka's return from leave. Plaintiff's Opposition, Ex. EE1, 10. Further, Maslanka has provided several letters from his physicians reiterating the same request as an accommodation for his diagnosis of anxiety and depression. <u>Id.</u> at Ex. E1-E4. Even though Maslanka did not specifically allege a failure to accommodate claim in his Complaint, a failure to accommodate is a kind of disability discrimination, which Maslanka did allege, and Maslanka's failure to accommodate claim is obvious from his EEOC Charge of Discrimination. Thus, in the interests of justice, the Court is willing to consider a failure to accommodate claim as having been alleged.[7]

**B. Summary Judgment Standard**

---

[7]It is questionable, however, whether Janssen has had fair notice of such a claim. <u>Fed. R. Civ. P. 8</u> requires that a complaint "provide a defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 499 (3d Cir. 1997) (citation omitted). Indeed, Janssen has not briefed the issue. Nonetheless, as explained <u>infra</u>, even if Maslanka did properly allege a failure to accommodate claim, Janssen would be entitled to summary judgment on that claim for the same reasons that Janssen is entitled to summary judgement on Maslanka's claim that his termination was a form of discrimination under the ADA.

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex, 477 U.S. at 330. When the burden of proof at trial is on the non-moving party, as in the case at bar, the moving party can satisfy its initial burden by submitting evidence that negates an essential element of the non-moving party's claim, or by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-movant's claim. Id. at 331. Once the moving party satisfies this initial burden, the non-moving party "must set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir.1999). A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248. In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." Curley v. Klem, 298 F.3d 271,

276-77 (3d Cir. 2002) (citation omitted).

## C. ADA Discrimination Claim

Maslanka's first claim is that his termination constituted disability discrimination under the ADA. The ADA provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, or other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). "Claims under the ADA . . . follow the familiar burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The plaintiff-employee bears the initial burden of proving a prima facie case of discrimination." Thimons v. PNC Bank, N.A., Docket No. 06-3815, 2007 WL 3082142, *1 (3d Cir. Oct. 23, 2007). "A plaintiff presents a prima facie case of discrimination under the ADA by demonstrating: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3d Cir. 1998) (citation omitted); see also Williams, 380 F.3d at 761 (citation omitted). If the plaintiff has made out a prima facie case, "[t]he burden then shifts to the employer to present a non-discriminatory reason for the adverse decision." Thimons, 2007 WL 3082142 at *1; see also Williams, 380 F.3d at 760 n. 3. "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext

for discrimination." Williams, 380 F.3d at 760 n. 3. The burden of persuasion remains at all times with the plaintiff. Id.

**1. Disability under the ADA**

As a threshold matter, Janssen argues that Maslanka cannot make our a prima facie of discrimination under the ADA because he has not provided sufficient evidence that he was disabled within the meaning of the ADA. "The term 'disability' means, with respect to an individual - (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Because Maslanka does not argue that he was regarded as having such an impairment, the Court will only consider whether Maslanka has a disability within the meaning of sections 12102(2)(A) or 12102(2)(B).

"The question of whether an individual is substantially limited in a major life activity is a question of fact." Williams, 380 F.3d at 763. "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" Toyota Motor Manufacturing v. Williams, 534 U.S. 184, 198 (2002) (citation omitted); see also Weisberg v. Riverside Tp. Bd. of Educ. 180 Fed. Appx. 357, 361 (3d Cir. 2006). "The Supreme Court has explained that an impairment satisfies the 'substantially limits' requirement, which should be read strictly, where the impairment is permanent or long-term and prevents or severely restricts the employee from 'doing activities that are of central importance to most people's daily lives.' The inquiry is an

19

individualized one, requiring plaintiffs to provide more than a simple medical diagnosis and instead offer evidence that 'the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial.'" <u>Yunckes v. Chertoff</u>, Docket No. 05-5766,  2008 WL 577229, *3 (D.N.J. Feb. 29, 2008) (quoting <u>Toyota</u>, 534 U.S. at 198).

The Third Circuit has explained that a plaintiff seeking statutory protection under the ADA for an actual disability, i.e., "a physical or mental impairment that substantially limits one or more of the major life activities," 42 U.S.C. § 12102(2)(A), must provide sufficient evidence to "[(1)] show that she has an impairment; [(2)] identify the life activity that she claims is limited by the impairment; and [(3)] prove that the limitation is substantial." <u>Fiscus v. Wal-Mart Stores, Inc.</u>, 385 F.3d 378, 382 (3d Cir. 2004) (citation omitted). Further, the Third Circuit has held that an ADA plaintiff must present evidence showing that the impairment is long-term, rather than temporary. <u>Williams</u>, 380 F.3d at 765; <u>see</u> <u>also</u> <u>Ashton v. American Tel. & Tel. Co.</u>, 225 Fed. Appx. 61, 66-67 (3d. Cir. 2007). Thus, the Court will apply the three-part framework laid out in <u>Fiscus</u> to record evidence of Maslanka's disability. <u>McGee v. Procter & Gamble Distributing Co.</u>, 445 F.Supp. 2d 481, 488 (E.D. Pa. 2006) ("Using [the <u>Fiscus</u>] framework, McGee must establish that he was diagnosed with depression, identify one or more major life activities that his depression has inhibited, and show that this limitation is substantial").

**a. Impairments**

The record indicates that Maslanka had two sorts of impairments while employed at Janssen, a physical and a mental impairment, each of which apparently caused Maslanka to take leave in June 2001. Plaintiff's Opposition, Ex. EE1, 1 ("In June . . . I became disabled with stress related depression, sleep disorder . . . and a concomitant knee injury"). As to Maslanka's knee

injury, upon returning to Janssen in December 2001, Maslanka was provided with the

accommodation of a minivan, and nothing in the record indicates the knee injury posed any

further problems for Maslanka at Janssen. More importantly, Maslanka's medical records

indicate that he suffered from emotional or mental impairments of anxiety and depression while

on leave. In August 2001, Dr. Reilly wrote to Janssen that Maslanka suffered from "significant

symptomatic Anxiety Disorder" and "Major Depression" which manifests, among other ways, in

"the inability to concentrate on . . . work tasks . . . disturbed sleep patterns, and inability to

motivate or concentrate on day to day routine tasks." Plaintiff's Opposition, Ex. E1-E4, 2.  In

November 2001, Dr. Mehta also wrote to Janssen, confirming the previous diagnosis, adding that

the condition manifests itself in "excessive crying, poor concentration, poor sleep patterns,

decrease in energy, feelings of hopelessness and helplessness." Id. at 7. Both physicians cited to

Maslanka's difficulties with Fronius, and recommended removing Maslanka from Fronius'

supervision as an accommodation for his condition. Dr. Mehta also stated that while he believed

that Maslanka was capable of performing "the essential functions of his job," his "current

situation with his manager creates an undue amount of stress and is aggravating his condition

and may cause the condition to progress to a debilitating disability." Id. at 1 (emphasis added).

     ADA regulations make clear that anxiety and depression are impairments under the

ADA. See 29 C.F.R. 1630.2(h)(2) ("(h) Physical or mental impairment means . . . (2) Any

mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional

or mental illness, and specific learning disabilities"); Ashton, 225 Fed. Appx. at 64, 66

(assuming that "generalized anxiety, agoraphobia and depression" was sufficient to constitute an

ADA impairment); Williams, 380 F.3d at 757, 762 (physician's finding that plaintiff "requires

psychological treatment for depression and stress management" analyzed as an impairment under the ADA). Thus, a reasonable jury could find that Maslanka suffered a "physical or mental" impairment within the meaning of the ADA.

**b. Major Life Activities**

Next, Maslanka must identify which major life activities were substantially limited by his impairments. Neither Maslanka's Complaint nor his opposition papers directly identify which major life activity he claims was substantially impaired, and it is not the Court's job to do this for him. Even if a record contains facts that might provide support for a non-movant's position, "the burden is on the [non-movant], not the court, to cull the record and affirmatively identify genuine, material factual issues sufficient to defeat a motion for summary judgment." Morris v. Orman, No. 87-5149, 1989 WL 17549, *8 (E.D. Pa. Mar.1, 1989) (citing Childers v. Joseph, 842 F.2d 689 (3d Cir.1988)); see also Atkinson v. City of Phila., No. 99-1541, 2000 WL 793193, *5 n. 8 (E.D. Pa. June 20, 2000). Nonetheless, in the interests of justice, and because Maslanka's pro se filings must be read liberally, the Court has searched Maslanka's submissions for evidence of such activities.

Pursuant to 29 C.F.R. § 1630.2(i), the phrase "major life activity" under the ADA "means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Letters from Maslanka's physicians to Janssen, as well as Maslanak's medical records, indicate that Maslanka's condition caused poor concentration, i.e., "the inability to concentrate on his work tasks . . . and inability to motivate to accomplish day to day routine tasks that are required," and "poor sleep patterns." Plaintiff's Opposition, Ex. E1-E4, 1-2. The Third Circuit has recognized poor concentration as falling

22

within the major life activity of cognitive function. Weisberg, 180 Fed. Appx. at 362 ("Learning, concentrating and remembering fall into the general category of cognitive function [and] [t]his court has held such activities to be major life activities")(citations omitted). Further, sleeping has received wide recognition as a major life activity by courts of appeals in other circuits, as well as district courts in the Third Circuit.  See Creasy v. Novelty, Inc., Docket No. 04-2296, 2005 U.S. Dist. Lexis 44841, 13-14 (E.D. Pa. 2005) (collecting cases); Peter v. Lincoln Tech. Inst., 255 F.Supp.2d 417, 432 (E.D. Pa. 2002) ("Sleeping has been recognized by many courts and the EEOC guidelines as a major life activity"). Finally, in his deposition, Maslanka also claims that his ability to work was affected by his impairments. When explaining his decision to take leave in June 2001, Maslanka stated: "The psychiatrist told me not to work. I was truly at that point incapable of working." Luedeke Decl., Ex. A, 115:17-18.

Thus, reading the record in the light most favorable to Maslanka, the Court will assume that Maslanka alleges he is limited in the major life activities of concentrating, sleeping and working.

**c. Were the Limitations on Maslanka's Major Life Activities Substantial?**

Finally, to satisfy the first element of his prima facie case of disability discrimination, i.e., that he was disabled within the meaning of the ADA, Maslanka must present sufficient evidence for a reasonable jury to find that his physical or psychological impairments substantially limited his major life activities of cognitive function, sleeping or working. Again, the Supreme Court has made clear that it is "insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection . . . to prove a

disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" Toyota Motor Manufacturing, 534 U.S. at 198 (citation omitted).

According to EEOC regulations, an individual is "substantially limited" in performing a major life activity if the individual is

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Further, factors to be considered in determining whether an individual is substantially limited in a major life activity are: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2); see also Williams, 380 F.3d at 762. With respect to the second and third factors, the Third Circuit has stated:

> As a matter of law, a "transient, nonpermanent condition," or "a temporary, non-chronic impairment of a short duration" . . . fall short of substantially limiting an individual in a major life activity. Accordingly, the EEOC has suggested, for example, that broken limbs, sprained joints, concussions, appendicitis, and influenza, being impairments of a temporary nature "with little or no long term or permanent impact," cannot as a matter of law substantially limit an individual in a major life activity. See EEOC Interpretive Guidance, 29 C.F.R. Pt. 1630, App. § 1630.2(j)(2).

Williams, 380 F.3d at 765.  Accordingly, the question is whether Maslanka has presented evidence "in terms of [his] own experience," Toyota Motor Manufacturing, 534 U.S. at 198,

bearing on the nature and severity of his impairments, their duration, and their potential for long term impact, from which a reasonable jury could conclude that Maslanka's impairments caused him to be unable to perform the major life activities of sleeping, concentrating, or working, or significantly restricted his ability to perform those activities compared to an average person. In other words, Maslanka must show not merely an impairment, but an impairment that results in a substantial limitation in one of these major life activities. The Court finds that Maslanka has not made a sufficient showing with respect to any of them.

Aside from Maslanka's medical records indicating "poor sleep patterns," and his mention of a "sleep disorder" in a letter to the EEOC, Plaintiff's Opposition, Ex. EE1, 1, the only evidence of the nature, duration or long-term impact of Maslanka's impairment on his sleep comes from his deposition. When questioned about his disability in his deposition, Maslanka stated: "When I discovered what Mr. Fronius was trying to do, the trauma of that wouldn't allow me to sleep.  I went three nights with absolutely no sleep over the weekend." Luedeke Decl., Ex. A, 112:22-25. He also elaborates:

> "I was disabled because over a period of one full year, maybe a little more, Bob Fronius harassed me in the workplace, discriminated against me, made my life miserable, made every work ride-with report false and misleading in an effort to terminate my employment. So all that puts pressure on a guy, okay?"

Id. at 157:22-25; 158:1-3.

Maslanka's assertion that he "went three nights over the weekend with absolutely no sleep" along with letters from his physicians that he suffers from "poor sleep patterns" is not sufficient to present a genuine dispute of material fact as to whether he is substantially limited in the major life activity of sleep. The letters from his physicians deal primarily with Maslanka's

diagnosis of depression and anxiety, only briefly referencing "disturbed sleep patterns" as an associated symptom. Regarding Maslanka's lack of sleep, there is no reference to his condition's severity, its duration, or its impact on his life. See Sloan v. Pittsburg, 110 Fed. Appx. 207, 212 (3d Cir. 2004) ("Difficulty sleeping is a common problem, and not a limitation of a major life activity unless the plaintiff shows a uniquely severe affliction") (citation omitted); Colwell v. Suffolk County Police Dept., 158 F.3d 635, 644 (2d Cir. 1998) ("Essentially Colwell's evidence [with respect to the major life activity of sleeping] was that he takes a medication as a sleep aid and that 'I usually get a tough night's sleep[;] [however,] [d]ifficulty sleeping is extremely widespread [and] Colwell made no showing that his affliction is any worse than is suffered by a large portion of the nation's adult population [, and thus] [h]e failed to establish that the degree of limitation he suffers is substantial"). Moreover, Maslanka's comment in his deposition regarding his difficulty sleeping suggests that his inability to sleep was a reaction to a specific situation (i.e.,  the stress of dealing with Fronius at a particular time), rather than a general inability to sleep. The Third Circuit has recently found, allbeit in a non-precedential opinion, that the requisite "long-term basis" of a substantial limitation was not satisfied by an impairment that "appeared to be situational, triggered by [an employee's] worsening relationship with her supervisor." Ashton, 225 Fed. Appx. at 66-67.

The same analysis applies to the argument that Maslanka was substantially limited in the major life activity of concentrating. Although Maslanka provides letters from his physicians indicating that "poor concentration" and "an inability to concentrate" are manifestations of his condition, Plaintiffs' Opposition, E1-E4, 1-2, and Maslanka twice took leave due to stress and/or panic attacks caused by his interactions with Fronius, Maslanka does not provide any evidence,

26

"in terms of [his] own experience," <u>Toyota Motor Manufacturing</u>, 534 U.S. at 198, of the

severity, nature, duration or long-term impact of his inability to concentrate. The only evidence

Maslanka provides of his inability to concentrate is Dr. Reilly's letter, written during Maslanka's

first disability leave, stating that Maslanka's "diagnosis manifests itself in . . . the inability to

concentrate on his work tasks or those things proven enjoyable by way of hobbies." Plaintiff's

Opposition, Ex. E1-E4, 2. Moreover, Maslanka's allegedly satisfactory job performance, <u>see</u>

Luedeke Decl., Ex. L. (the "body of evidence shows my job performance was meeting or

exceeding high standards"), indicates that any limitation on Maslanka's ability to "to concentrate

on . . . work tasks" lacked long-term duration or impact.

     The record only supports a reasonable inference that, like Maslanka's difficulty sleeping,

Maslanka's stress and panic attacks (which the Court must speculate were accompanied, in terms

of Maslanka's own experience, with a corresponding inability to concentrate) were situational.

In this regard, <u>Ashton</u>, a recent non-precedential Third Circuit case involving an alleged

limitation on the major life activity of thinking, is directly on point. The plaintiff alleged "that

she was disabled by generalized anxiety, agoraphobia and depression, which substantially

limited the major life activity of thinking." <u>Ashton</u>, 225 Fed. Appx. at 64. The defendant

employer "moved for summary judgment, contending that Ashton was not disabled under the

ADA because she failed to provide sufficient evidence that she was impaired and because the

alleged impairment was temporary and did not substantially limit a major life activity." <u>Id.</u>  The

court found that the plaintiff's limitation was temporary:

> The record shows that Ashton's impairment was temporary, lasting a total of
> three months. Even assuming in Ashton's favor that her impairment lasted from
> June through December 2002, she cannot show that her ability to think was

substantially limited on a long-term basis rather than being of limited duration. See McDonald v. Commonwealth of Pa., Dep't Public Welfare, Polk Ctr., 62 F.3d 92, 95 (3d Cir.1995) (holding that a disability of limited duration is not considered a disability under the ADA). At best, Ashton's impairment appeared to be situational, triggered by her worsening relationship with her supervisor. Moreover, there is nothing in this record to show that Ashton suffered negative long-term or permanent impact from her impairment. She received mixed performance reviews before she experienced the onset of her symptoms in June 2002. She does not claim, and the record does not show, that her medications produced side affects that negatively impact her ability to think on a long-term basis.

Id. at 66-67.

The record in the case at bar indicates that, at best, a reasonable jury could find that Maslanka's impairment is analogous to the temporary and situational impairment in Ashton. Maslanka took a five month disability leave from June 2001 through December 2001. Maslanka's letters from his physicians indicate that his anxiety and depression were related to his interactions with Fronius. Maslanka returned to work from December 2001 through May 28, 2002, when Maslanka suffered a panic attack allegedly due to a conversation with Fronius and again took leave. Maslanka was terminated effective May 30, 2002, while he was on leave. Given that Maslanka claims his work performance met or exceeded expectations; that his inability to work and need for leave was triggered by his stressful interactions with Fronius; and that he was able to return to work after his first leave "without restriction" (except for a recommendation to be placed with a different supervisor), the record only supports the inference that "[a]t best, Maslanka's impairment appeared to be situational, triggered by [his] worsening relationship with [his] supervisor." Ashton, 225 Fed. Appx. At 66-67; see also McDonald v. Com. of Pa.., Dept. Of Public Welfare, 62 F.3d 92, 96 (3d Cir. 1995) ("Intermittent, episodic impairments are not disabilities"). The evidence of Maslanka's inability to concentrate due to

stressful interactions with Fronius, even if that inability was severe, would not allow a reasonable jury to find that the alleged impairment was of long-term duration or impact, rather than merely temporary or situational.

 The major life activity of working is also unavailing for Maslanka. The Third Circuit has recently laid out the framework for assessing whether a person is substantially limited in the life activity of work:

> The EEOC regulations provide that, in determining whether an individual is restricted in the major life activity of working,
>
> [t]he term 'substantially limits' means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.
>
> 29 C.F.R. § 1630.2(j)(3)(i). Several specific additional factors are to be considered in determining whether an individual is substantially limited in the major life activity of working:
>
> (A) The geographical area to which the individual has reasonable access;
>
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).
>
> Id. § 1630.2(j)(3)(ii).

Williams, 380 F.3d 751 at 762-63.

 Summarizing these regulations, the Supreme Court has held that:

29

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

Sutton v. United Air Lines, Inc., 527 U.S. 471, 493 (1999); see also Williams, 380 F.3d at 763.

Maslanka has presented no evidence that his impairments caused him to be precluded from either a broad range of jobs or a class of jobs. If anything, Maslanka's allegations and evidence confirm that he is not limited in the major life activity of working. During Maslanka's first leave from Janssen, Dr. Mehta wrote: "I believe that Mr. Maslanka is capable of performing the essential functions of his job and that the current situation with his manager creates an undue amount of stress and is aggravating his condition and may cause the situation to progress to a debilitating disability." Plaintiff's Opposition, Ex. E1-E4, 1 (emphasis added). Further, Dr. Metha recommended that Maslanka be returned to his full duties "without restrictions," aside from the suggestion that he be removed from Fronius' supervision. Luedeke Decl., Ex. D. Thus, according to his own physician, Maslanka's condition did not preclude him from performing his job at Janssen, much less "a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Moreover, Maslanka's Complaint alleges that his job performance at Janssen met or exceeded expectations, and the record indicates that Maslanka has held two jobs in the field of pharmaceutical sales since his termination at Janssen. Plaintiff's Opposition, Ex. B5.  Again, on this record, a reasonable jury could only conclude that Maslanka's inability to work at Janssen was temporary and situational, i.e., limited to performing his job under the stressful supervision

of Fronius. But the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Thus, the Court finds that, as a matter of law, Maslanka has not provided sufficient evidence from which a reasonable jury could conclude that he was substantially limited in the major life activity of working.

Thus, because Maslanka has not provided evidence from a which a reasonable jury could conclude that he was substantially limited in a major life activity, the Court finds that Maslanka was not "disabled" within the meaning of the ADA.[8] Since Maslanka cannot make out a prima facie case of discrimination under the ADA, even if Maslanka had alleged a failure to accommodate claim in addition to his wrongful termination claim, Janssen would be entitled to summary judgement on both claims.

**2. Is Janssen's Non-Discriminatory Reason For Terminating Maslanka Pretextual?**

Even assuming arguendo that Maslanka provided sufficient evidence to satisfy the three elements of the prima facie case for a claim of discrimination under the ADA regarding his termination, Maslanka's claim would still fail as a matter of law at the third stage of the McDonnell Douglas analysis. As the Third Circuit recently explained in Thimons:

> Once an employer presents a non-discriminatory reason for termination under the ADA . . . the employee must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir.2005). See also Smith v. Davis, 248

---

[8]For the same reasons that Maslanka has not established that he was disabled within the meaning of the ADA, Maslanka has not established that he has a record of such disability. "For [Maslanka] to show that he had a record of disability, he must show that he had a record of some condition that would be considered a disability under the ADA. Because [Maslanka] cannot prove that he has a disability under the act, he also cannot show that he has a record of disability that would make him a qualified individual under the ADA." McGee, 445 F.Supp.2d at 489.

31

> F.3d 249 (3d Cir.2001) (reversing a grant of summary judgment for an alcoholic because defendants did not present a sufficient legitimate reason for his termination). The plaintiff's claim will not survive a summary judgment motion if he/she fails to fulfill the third step. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994).
>
> To survive summary judgment at the third stage of the McDonnell Douglas analysis, the plaintiff must present sufficient evidence to allow a factfinder to conclude that the employer's non-discriminatory reason was a post hoc fabrication, or pretext. Id. "[T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir.1998).
>
> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."
>
> Fuentes, 32 F.3d 765.

Thimons, 2007 WL 3082142 at *1-2. "While this standard places a difficult burden on the plaintiff, '[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs.'" Fuentes, 32 F.3d at 765 (citation omitted).

Janssen's proffered reason for terminating Maslanka was that he violated the company's Health Care Compliance Policy when he used his corporate American Express card to purchase an airline ticket for Dr. Hess' wife. Luedeke Decl., Ex. G. Thus, to survive summary judgment at the third stage of the McDonnell Douglas analysis, Maslanka must present sufficient evidence for a reasonable jury to find Janssen's explanation unworthy of credence, and that it was a pretext for discrimination based on Maslanka's alleged disability.

32

The Janssen Health Care Compliance Policy states: "Janssen does not encourage inviting spouses or guests to Janssen sponsored events. However, in the event that the spouse attends, <u>only</u> entertainment and meals can be expensed." Fronius Decl., Ex. I (emphasis added). Maslanka concedes that he used his corporate credit card to book a plane ticket for Dr. Hess' wife. Nonetheless, he argues that his conduct should not be construed as violating the Health Care Compliance Policy because: (1) Janssen's policy is ambiguous; (2) the policy (as understood by Janssen) is contradicted by the actual invitation that Maslanka was to extend to Dr. Hess; (3) both Maslanka and Dr. Hess understood that Maslanka was purchasing the tickets as a courtesy, with the expectation that Dr. Hess would reimburse Janssen; (4) at no time was Maslanka told by any Janssen personnel that he was violating company policy when he booked tickets for Dr. Hess and his wife with the corporate card. Plaintiff's Opposition, 2-3; Maslanka Decl., ¶¶5-11; Supp. Maslanka Decl., ¶3.

These arguments are insufficient to create a material issue of fact as to whether Janssen's termination of Maslanka was pretextual. First, as set forth in the the "highlights" of the Health Care Compliance Policy and the invitation that Maslanka was to provide to Dr. Hess, the policy is clear: the travel expenses of spouses are not to be paid for by Janssen. <u>See</u> Fronius Decl., Ex. I ("in the event that the spouse attends, <u>only</u> entertainment and meals can be expensed") (emphasis added); Plaintiff's Opposition, Ex. A1, 4 ("*Due to Healthcare Compliance Guidelines, Janssen . . . will not be able to cover any additional hotel requirements and meals that are not program sponsored. All guest travel, meals and activities are the responsibility of that individual*") (emphasis in original). Furthermore, Maslanka concedes that this policy was emphasized in his job training as a serious issue. Luedeke Decl., Ex. A, 31:3-32:10.

33

Second, the invitation that Maslanka was given to extend to Dr. Hess is not inconsistent with Janssen's Heath Care Compliance Policy. Maslanka points to the invitation's language that "our travel agents will be able to assist you in arranging your spouse/guest's airline ticket." Plaintiff's Opposition, 3. However, as Janssen points out, that sentence appears right beneath a clear statement of the compliance policy:

> Your hotel room, air and ground transportation along with all group meal functions are provided by Janssen Pharmaceutica. *Please note: Due to Healthcare Compliance Guidelines, Janssen . . . will not be able to cover any additional hotel requirements and meals that are not program sponsored. All guest travel, meals and activities are the responsibility of that individual. Please see "Activity Form."* Our travel agents will be able to assist you in arranging your spouse/guest's airline ticket.

Plaintiff's Opposition, Ex. A1, 4. When read in context, the language that Maslanka selectively quotes is obviously directed to the invitee physician. Thus, the paragraph clearly provides that Janssen's travel agents would assist physicians with their travel plans and the travel plans of spouses, but that the physician (or the spouse) would be responsible for paying for the travel expenses of the spouse.

Finally, even accepting Maslanka's claim that he had an agreement with Dr. Hess that Dr. Hess would reimburse Janssen for the cost of his spouse's travel expenses, that does not change that fact that Janssen's compliance policy was violated. Indeed, as Janssen argues, it creates precisely the appearance of impropriety that the policy seems designed to prevent. Moreover, as Janssen points out, Maslanka does not provide any evidence that anyone at Janssen was aware of his agreement with Dr. Hess when the decision was made to terminate him.

Thus, Maslanka has not presented sufficient evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Thimons, 2007 WL 3082142 at *2. Nor is there any other evidence suggesting Maslanka was terminated because of his alleged impairments. In addition to the fact that Maslanka has failed to directly challenge the rationale for his termination, Maslanka has presented no evidence that Janssen's Health Care Compliance Policy was applied to him in a discriminatory manner, by showing, for example, that other employees violated the same policy with different disciplinary results. Maslanka may have provided evidence to rebut the assertion that he was less than a competent employee, but that is not the proffered reason for the adverse employment action taken against him.

Maslanka implicitly claims that since this was his first experience with making travel arrangements for a client, Supp. Maslanka Decl. ¶3, and such short notice was given to Dr. Hess, Maslanka Decl., ¶9; Hess Decl., ¶3, termination for this infraction – even if it was a policy violation – was unduly harsh. However, a plaintiff cannot present sufficient evidence of pretext in the third stage of the McDonnell Douglas analysis merely by suggesting that an employer's decision is harsh, unfair or even simply mistaken. "[I]t is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus. Hence, to make a sufficient showing of pretext, [Maslanka] must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in [Janssen's] reasons that "a reasonable factfinder could rationally find them 'unworthy of credence.'" Abramson v. William Paterson College of N.J., 260 F.3d 265, 283 (3d

Cir. 2001) (emphasis in original) (citation omitted). Maslanka has not provided any evidence to impeach the credibility of Janssen's determination that he violated the Heath Care Compliance Policy, to suggest that the policy was applied in a discriminatory matter, or to suggest that Maslanka was terminated because of his impairments. Thus, Maslanka has failed to "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision," Thimons, 2007 WL 3082142 at *1, and Janssen is therefore entitled to summary judgment on Maslanka's claim of disability discrimination.

**D. Hostile Work Environment Claim**

Maslanka's next claim is that Fronius' actions subjected him to a hostile work environment because of his disability. "A claim for harassment based on disability, like one under Title VII, would require a showing that: (1) [Maslanka] is a qualified individual with a disability under the ADA; (2) []he was subject to unwelcome harassment; (3) the harassment was based on [his] disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment; and (5) that [Janssen] knew or should have known of the harassment and failed to take prompt effective remedial action."[9] Walton v. Mental Health Assoc. of Southeastern Pennsylvania, 168 F.3d 661, 667 (3d Cir. 1999).

For the reasons given in section III.C.1., supra, Maslanka is not "a qualified individual with a disability" and therefore cannot satisfy the first element. Thus, Maslanka's claim fails as a matter of law and Janssen is entitled to summary judgment on that claim.

**E. Retaliation Claim**

---

[9]Without holding that the ADA creates a hostile work environment cause of action, the court stated what the requirements of such an action would be. Walton, 168 F.3d at 666-67.

Maslanka's next claim is that he was subject to retaliation for complaining to the EEOC and otherwise objecting to the alleged discriminatory practices of Janssen. The ADA protects against retaliation: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "Based on this language, the Third Circuit has held that an ADA retaliation claim may be brought pursuant to § 12203(a) even when a plaintiff's disability discrimination claim is unsuccessful." McGee, 445 F. Supp.2d at 490 (citing Krouse, 126 F.3d at 498). Thus, Maslanka may pursue a retaliation claim under the ADA even though the Court finds that he is not disabled within the meaning of the ADA.

"[I]n order to establish a prima facie case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. " Williams, 380 F.3d at 759. The McDonnell Douglas burden-shifting framework also applies to retaliation claims. Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) ("We have indicated that the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to ADA disparate treatment and retaliation claims").

**1. Protected Activities**

The Third Circuit has held that protected employee activities include filing a complaint with the EEOC, making a good-faith request for an accommodation, even if the individual is not covered by the ADA, Schellenberger v. Summit Bankcorp, Inc., 318 F.3d 183, 188, 191 (3d Cir.

37

2003), and making complaints to management regarding discriminatory employment practices. Abramson, 260 F.3d at 288. The record indicates that Maslanka has engaged in all three kinds of protected activity. In April 2001, Maslanka filed a complaint with the EEOC alleging that he had been discriminated against by Janssen. Luedeke Decl., Ex. B. In May, 2001, Maslanka wrote a letter to Stan Davis complaining that Fronius' actions were creating a hostile work environment, and requesting to be removed from Fronius' supervision. Plaintiff's Opposition, Ex. EE1, 8. A letter from Maslanka to Marion Smith, dated December 5, 2001, makes the same request upon Maslanka's return from leave. Plaintiff's Opposition, Ex. EE1, 10. During Maslanka's first disability leave from June 2001 to December 2001, his physicians repeatedly requested that Maslanka be removed from his immediate supervisor as an accommodation for his anxiety and depression. Finally, in January or February 2002, Maslanka invoked Janssen's alternative dispute resolution process regarding his relationship with Fronius. Fronius Decl., ¶12.

**2. Adverse Employment Actions**

Maslanka argues that Janssen took three forms of adverse employment action against him in retaliation for his protected activities. First, he was terminated. Plainitff's Opposition, 1. Second, Maslanka claims "Human Resources at J&J was deliberately thwarting [his] efforts to gain new employment" after he was terminated. Supp. Maslanka Decl., ¶3. Third, Maslanka claims that Fronius improperly contacted Maslanka on May 28, 2002 "in an intimidating and threatening tone" and allegedly in violation of "the policy of Mediation" in place between Maslanka and Fronius. Supp. Maslanka Decl., ¶3; Plaintiff's Objections, 4.[10]

---

[10]Maslanka does not assert in his Complaint or opposition papers that his negative evaluations and Formal Warnings from Fronius were a form of retaliation, and thus the Court will not consider them as such. Plaintiff's Opposition, 1 ("Plaintiff engaged in protected activity and . . . suffered adverse action after the protected activity (i.e., he was fired)"). Even if he did so argue,

However, Maslanka has provided no evidence for these latter assertions. With respect to the negative references to other employers, Maslanka merely affirms that: "Further actions of retaliation continued during the 6 month period of my job search. In each case where I became a final candidate for a position, I was disqualified after the hiring party contacted Human Resources at J&J." Supp. Maslanka Decl., ¶3. Maslanka also provides an <u>unsigned</u> affidavit of Larry Koz, claiming that Koz <u>would</u> have stated under oath that he received negative feedback and a negative reference regarding Maslanka from Human Resources at J&J, however "Koz is unable to be reached." Plaintiff's Opposition, Ex. A2. This unsigned affidavit, drafted by Maslanka, is of no evidentiary value and will be disregarded. <u>J.F. Feeser, Inc. v. Serv-A-Portion, Inc.</u>, 909 F.2d 1524, 1542 (3d Cir. 1990) ("<u>Fed. R. Civ. P.</u> 56(e) requires the production, at the summary judgment stage, of evidence as would be admissible at trial and thus reduc[ible] to admissible evidence") (internal quotations and citation omitted). Because Maslanka provides no evidence that Janssen was "deliberately thwarting" his efforts to gain employment beyond bare speculation and conjecture, <u>Waters v. NMC-Wollard, Inc.</u>, Docket No. 06-0032, 2007 WL 2668008, *4 (E.D. Pa. Sept. 5, 2007) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment") (quoting <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360, 382 n. 12 (3d Cir.1990)), he fails to make out a <u>prima facie</u> case of retaliation on this ground.

Maslanka's assertion that Fronius' contact with him on May 28, 2002, was a violation of Janssen policy is also mere speculation and conjecture. Although Fronius and Maslanka dispute whether or not Fronius had any prior contact with Maslanka during the mediation program,

_____

he has not presented evidence sufficient to establish a <u>prima facie</u> case of causation with respect to his negative evaluations.

39

Fronius Decl., ¶12; Plaintiff's Objections, 4, Maslanka has provided no evidence that the program forbids any contact between them. The Court also notes that it is questionable whether a telephone call evincing a harsh tone is sufficient to constitute retaliatory conduct, even if Janssen's mediation policy prohibited contact between Maslanka and Fronius. As the Supreme Court recently stated in clarifying the required adverse employment action in the context of a Title VII retaliation claim:

> In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"
> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006) (internal citations omitted).

Thus, in assessing Maslanka's retaliation claim, the Court will only consider the adverse action of termination.

**3. Causation**

The Third Circuit has "set forth no limits on what [courts should be] willing to consider" in satisfaction of the causation requirement in a retaliation claim. Courts should be "willing to

explore the record in search of evidence" of causation.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).

A plaintiff may establish a causal link between a protected activity and the employer's adverse action through temporal proximity alone if the timing is "unusually suggestive" of a retaliatory motive. Williams, 380 F.3d at 760; Krouse 126 F.3d at 503. Maslanka went on sick leave on May 28, 2002, due to a panic attack allegedly triggered by a conversation with Fronius. Plaintiff's Objections, 4. He was terminated effective May 30, 2002, only two days later (however, the letter informing Maslanka of his termination was not written until June 14, 2002). Luedeke Decl., Ex. G. Although the close proximity between Maslanka's leave and his termination might be "unusually suggestive" of a causal link, Maslanka does not specifically represent that he requested an accommodation or even notified Janssen of the incident, other than Maslanka's vague comment that he "was placed on sick leave." Plaintiff's Objections, 4.[11] Maslanka's next closest protected activity to his termination was his invocation of Janssen's internal dispute resolution process regarding Fronius' alleged harassment of Maslanka in January or February 2002. As to this protected activity, Maslanka's termination over three months later cannot be said to be "unusually suggestive of retaliatory motive." Williams, 380 F.3d at 760. In Williams, for example, the Third Circuit found that two months between the protected activity and alleged retaliatory conduct was not so close as to be unusually suggestive of a retaliatory motive. Id.

---

[11]Maslanka provides a note from Dr. Mehta dated May 29, 2002, stating that Maslanka "is currently suffering from a severe panic attack and is unable to return to work for at least 4 working days."Plaintiff's Opposition, Ex. EE1, 6. The note indicates that it was copied to the EEOC and Nancy Carroll, who Maslanka does not identify. Dr. Mehta wrote a similar note on June 6, 2002, stating that, "Due to his condition in relation to his Boss, [Maslanka] is unable to return to work until further notice," which was also copied to the EEOC. Id. at 7.

"Where the temporal proximity is not so close as to be unduly suggestive, [the Third Circuit has] recognized that timing plus other evidence may be an appropriate test." Id. (citation omitted). In such circumstances, the plaintiff may rely on other circumstantial evidence showing a pattern of antagonism during the period between the protected activity and the adverse employment action.  Abramson, 260 F.3d at 288; Krouse, 126 F.3d at 503-04. Maslanka's first protected act was the filing of an EEOC complaint on April 23, 2001. In that complaint, Maslanka alleges that, during a "ride with" in April 2001, Fronius became "incensed" and harshly criticized Maslanka.[12] In a letter to Stan Davis, written in May 2001, Maslanka complains about Fronius' "hostile behavior during ride-with sessions," "repeated threatening remarks regarding [Maslanka's] career with Johnson and Johnson," and use of "intimidating tactics." When Maslanka returned from disability leave in December 2001, the pattern of antagonism allegedly continued. In his formal charge of discrimination with the EEOC, filed on September 20, 2002, Maslanka claims that, upon his return to work, Fronius told him that "he did not care about [Maslanka's] disability and was going to pick up where he left off before [Maslanka] went on leave." According to Maslanka, Fronius "continued his harassment" and said, "if [Maslanka's] numbers did not improve, [Maslanka] would not be long for this world as far as Janssen was concerned." Luedeke Decl., Ex. H. Finally, in May 2002, during a period in which Maslanka claims there was supposed to be no contact between Fronius and Maslanka pursuant to the alternative dispute resolution process, and further claims that there had been no

---

[12]Although this incident occurred prior to Maslanka's complaint to the EEOC, it is probative of an antagonistic relationship between Maslanka and Fronius that could be found to continue after Maslanka reported Fronius to the EEOC.

contact between them since the inception of that process in February 2002,[13] Fronius telephoned

Maslanka "in an intimidating and threatening tone" to demand a meeting the following day,

which caused Maslanka to have a panic attack. Supp. Maslanka Decl., ¶3; Plaintiff's Objections,

4. Thus, Maslanka has provided evidence of a general pattern of antagonism between Fronius

and Maslanka, which lasted up until two days before Maslanka's termination.[14]

   In sum, the Court finds that Maslanka has presented sufficient evidence for a reasonable

jury to find a pattern of antagonism between himself and Fronius during the period when he

engaged in various protected activities which, when coupled with the proximity of his latest

protected activities, i.e., going on disability leave in late May 2002 and invoking the mediation

process in January or February of 2002, to his termination effective May 30, 2002, is sufficient

to establish a prima facie case of causation.

**4. Janssen's Legitimate Non-retaliatory Reason for Maslanka's Termination**

   Even though Maslanka has provided sufficient evidence to make out a prima facie case

for an ADA retaliation claim regarding his termination, Janssen argues that Maslanka cannot

create a material issue of fact as to whether Janssen's proffered legitimate, non-discriminatory

---

[13]Though Fronius claims he continued to contact Maslanka for administrative manners, Fronius Decl., ¶12, all factual disputes are resolved in favor of Maslanka at this stage of the proceedings. Note that the Court is here considering the May 2002 conversation between Fronius and Maslanka merely as evidence of an antagonistic relationship, not as an independent act of retaliation.

[14] Though Fronius claims not to have been involved in the decision to terminate Maslanka, Fronius Decl., ¶14, Stan Davis, who signed Maslanka's termination letter, Luedeke Decl,. Ex. G, was aware of Maslanka's complaints to the EEOC, Luedeke Decl., Ex. J., as well as the nature of the relationship between Fronius and Maslanka. Plaintiff's Opposition, EE1, 8. Further, in a summary of his problems at Janssen written to Marion Smith, dated "12/05/2001," Maslanka complained about Davis' handling of the situation between Maslanka and Fronius, and copied the letter to the EEOC. Id. at 10.

reason for his termination was pretextual. The Court agrees.  The Third Circuit outlined the

burden shifting framework for an ADA retaliation claim based on a "pretext" theory[15] as follows:

> If an employee establishes a <u>prima</u> <u>facie</u> case of retaliation under the ADA, the
> burden shifts to the employer to advance a legitimate, non-retaliatory reason for
> its adverse employment action. The employer's burden at this stage is "relatively
> light: it is satisfied if the defendant articulates any legitimate reason for the
> [adverse employment action]; the defendant need not prove that the articulated
> reason actually motivated the [action]."
> If the employer satisfies its burden, the plaintiff must be able to convince the
> factfinder both that the employer's proffered explanation was false, and that
> retaliation was the real reason for the adverse employment action. The plaintiff
> must prove that retaliatory animus played a role in the employer's
> decisionmaking process and that it had a determinative effect on the outcome of
> that process. The burden of proof remains at all times with the plaintiff.
> To obtain summary judgment, the employer must show that the trier of fact could
> not conclude, as a matter of law, (1) that retaliatory animus played a role in the
> employer's decisionmaking process and (2) that it had a determinative effect on
> the outcome of that process. This may be accomplished by establishing the
> plaintiff's inability to raise a genuine issue of material fact as to either: (1) one or
> more elements of the plaintiff's <u>prima</u> <u>facie</u> case or, (2) if the employer offers a
> legitimate non-retaliatory reason for the adverse employment action, whether the
> employer's proffered explanation was a pretext for retaliation.

<u>Krouse</u>, 126 F.3d at 500-01 (citations omitted).

For the reasons explained in section III.C.2., <u>supra</u>, Maslanka has failed to raise a

genuine issue of material fact as to whether Janssen's legitimate, non-retaliatory reason for his

termination was pretextual. Thus, even if Maslanka satisfies the elements of a <u>prima</u> <u>facie</u> case of

retaliation under the ADA, Janssen is entitled to summary judgment on Maslanka's claim of

retaliation at the third stage of the <u>McDonnell Douglas</u> analysis.

**IV. Conclusion**

---

[15]Maslanka argues that Janssen's justification for his termination was pretextual. Plaintiff's
Opposition, 2-3.

For the above reasons, Janssen's motion for summary judgment on Maslanka's ADA discrimination, retaliation and hostile work environment claims is granted. An appropriate order will follow.


Date: March 31, 2008                                /s/ Freda L. Wolfson
                                                    Honorable Freda L. Wolfson
                                                    United States District Judge

45